IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | |
|---|---|
| LYNETTE CHRISTMAS, | * |
| Plaintiff, | * |
| vs. | * |
| | *   CASE NO. 4:19-CV-53 (CDL) |
| SHERIFF ROBERT MICHAEL JOLLEY and THOMAS CARL PIERSON, | * |
| | * |
| Defendants. | * |
| | * |

O R D E R

This action arises from an alleged sexual assault by former Harris County deputy sheriff Thomas Carl Pierson against Lynette Christmas during a traffic stop. Christmas sued both Pierson and Harris County Sheriff Robert Michael Jolley pursuant to 42 U.S.C § 1983, alleging violations of the Fourth and Fourteenth Amendments.[1] Jolley seeks summary judgment on Christmas's claim against him in his individual capacity, arguing that he is entitled to qualified immunity. For the reasons explained in the remainder of this Order, Jolley's motion (ECF No. 29) is granted.

---

[1] The Court previously dismissed Christmas's claims against Jolley and Pierson in their official capacities, all claims against Harris County, and the state law claim against Jolley in his individual capacity. *Christmas v. Harris Cnty.*, No. 4:19-CV-53 (CDL), 2019 WL 3767471, at *6 (M.D. Ga. Aug. 9, 2019).

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Christmas, the factual record establishes the following.

On the morning of February 14, 2016, Pierson pulled Christmas over for speeding.  Pierson let Christmas go with a warning.  Shortly after that, Pierson activated his blue lights and pulled her over again and told Christmas to pull her car off onto a side road.  Christmas did as she was told, and Pierson followed her.  Christmas asserts that Pierson removed her from her vehicle and forced her to perform oral sex on him.

Later that day, Christmas reported the assault to the Pike County Sheriff's Office. The Pike County Sheriff's Office called Jolley to report the incident, and Jolley immediately asked the Georgia Bureau of Investigation ("GBI") to investigate the allegations. The next day, Jolley spoke with Pierson about the incident. Pierson admitted to engaging in sexual activity with Christmas but claimed that it was consensual. Jolley promptly fired Pierson. Pierson was later convicted for his conduct with Christmas and for two other incidents that came to light during the GBI's investigation.

The GBI investigated Christmas's allegations. In addition, Jolley sent letters to women who had been stopped by Pierson and received warning citations during the previous six months. Jolley got two responses and turned them over to the GBI. One response was from C.T., who reported to the GBI that Pierson stopped her in September 2015. During the 26-minute traffic stop, Pierson told C.T. that he wanted to arrest her so he could look at her all day and that "we love the tits and you have nice ones." Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. A, GBI Investigative Summary Exhibit 16 1, ECF No. 36-3 at 45. C.T. also reported to the GBI that Pierson followed her to her grandmother's home uninvited. *Id.* at 2. The other response was from L.F., who reported to the GBI that Pierson stopped her in October 2015 and showed her a video of him having sex with a

3

woman, which made L.F. uncomfortable.  GBI Investigative Summary Exhibit 14 2, ECF No. 36-3 at 40.  The 45-minute stop did not end until another deputy arrived and began speaking with Pierson.  *Id.* at 3.  The next day, Pierson went to L.F.'s house unannounced while on duty and in uniform, but L.F. did not answer the door.  *Id.* at 4.

During the GBI investigation, Harris County Sergeant Goodrich received notification from Harris County 911 that M.A. reported that she had been assaulted by Pierson.  Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. A, GBI Investigative Summary Exhibit 41 1, ECF No. 36-3 at 92.  Goodrich interviewed M.A., who reported that she had been stopped by Pierson approximately eight months prior and that Pierson told M.A. he would let her go without a citation if she performed oral sex on him; M.A. complied and was released.  *Id.*  Upon receiving this information, Harris Chief Deputy Chris Walden discovered that Pierson had completed a report on his stop of M.A., but when Walden attempted to pull the GPS locations for Pierson's patrol vehicle, he found that Pierson's GPS did not record his location for approximately one hour following his encounter with M.A.  Jolley was not aware of this incident or the incidents with C.T. and L.F. before the GBI investigation.  Pierson's immediate supervisor, Sergeant Joseph Harmon, was also unaware of any complaints about Pierson before the incident with Christmas.

4

If a citizen makes a written complaint about a deputy's inappropriate conduct during a traffic stop, then those complaints are investigated and kept in the deputy's file. Jolley Dep. 15:3-16:4, ECF No. 32-2. The sheriff's office does not, however, keep track of complaints made when someone calls to "bitch about a stop" but declines to make a written complaint. *Id.* at 94:9-18. Before the incident with Christmas, Harmon never received any complaints about his deputies acting inappropriately towards women while on duty. Except for one incident in 2002, which led to Jolley firing a deputy for violating his policy against forming romantic relationships with individuals met on duty, Jolley had never had a deputy report to him that deputies were "doing stuff with their traffic stops" that was "inappropriate." *Id.* at 95:7-12. Christmas did not point to any evidence that C.T., L.F., or M.A. contacted the Harris County Sheriff's Office to report Pierson's inappropriate conduct before the GBI investigation. Christmas did point to evidence that Jolley received a call from A.A., Pierson's ex-wife, who told Jolley that she believed Pierson stalked her in his patrol vehicle. Jolley "looked into it" but found "there was nothing to her allegation" because Pierson was not working on the day in question. *Id.* at 62:13-63:2.

Jolley has a policy prohibiting his employees from engaging in sexual activity of any nature while on duty, although Pierson

5

does not recall being trained on this policy. Jolley also has a policy against any deputy forming romantic relationships with individuals they meet while on duty.[2]

Although Pierson testified about a "locker-room mentality" among the deputies who bragged about flirting with and hooking up with women, Pierson Dep. 54:13-22, ECF No. 32-1, he could not recall any deputy bragging about flirting with women during traffic stops; nor could he "say firsthand" that he had seen it happen. *Id.* at 54:23-55:12. Pierson further testified that he did not feel close enough to Jolley to use "locker-room talk" around him and that he did not witness any other deputies use "locker-room talk" around Jolley. *Id.* at 55:21-56:13. Pierson did testify that he used "locker-room talk" around Harmon but that he did not brag to Harmon about flirting with women during traffic stops. *Id.* at 56:14-57:6. Finally, Pierson testified that deputies told each other when they stopped "a good-looking woman and talk to her for a little while or something, not specifics into flirting, but just more or less recognizing or taking notice of someone." *Id.* at 57:1-6.

---

[2] Christmas argues that Jolley did not enforce the policy because he "does not know whether the incidents" with L.F. and C.T. "were a violation of the policy." While the cited testimony does establish that Jolley declined to express an opinion on the appropriateness of the L.F. and C.T. stops, it also demonstrates that Jolley did not know about these traffic stops or the stop of M.A. before the GBI investigation. Jolley Dep. 74:6-12, 75:25-76:19.

DISCUSSION

Jolley seeks the protection of qualified immunity, which shields "government officials performing discretionary functions from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018) (quoting *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003)). A law enforcement officer acting within his discretionary authority is "entitled to qualified immunity from suit unless a plaintiff can establish that (1) the officer violated a constitutional right, and (2) the right violated was clearly established." *Alston v. Swarbrick*, 954 F.3d 1312, 1318 (11th Cir. 2020).[3] In determining whether a defendant is entitled to qualified immunity at the summary judgment stage, the Court must "resolve any issues of material fact in favor of the plaintiff." *Id.* at 1317-18.

Supervisory officials like Jolley "are not liable under § 1983 for the unconstitutional acts of their subordinates 'on the basis of respondeat superior or vicarious liability.'" *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (quoting *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994)). "Instead, supervisory liability under § 1983 occurs

---

[3] Christmas does not presently dispute that Jolley acted in his discretionary authority when he supervised Pierson.

either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *abrogated in part on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that district courts may consider either prong of the qualified immunity analysis first) and *Randall v. Scott*, 610 F.3d 701, 703 (11th Cir. 2010) (finding no heightened pleading requirement)). Here, Christmas does not argue that Jolley personally participated in Pierson's alleged unconstitutional conduct. She maintains, however, that Jolley's conduct contributed to Pierson's violation of her clearly established constitutional right to be free from sexual assault during a traffic stop.

Preliminarily, the Court finds based upon the present record that Pierson violated Christmas's clearly established constitutional rights when he stopped her the second time without a legitimate reason and when he sexually assaulted her. *See, e.g.*, *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997) (acknowledging Fourteenth Amendment due process liberty right against sexual assaults under color of state law); *see also Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002) (stating that it is a clear constitutional violation to use significant force that is "wholly unnecessary to any legitimate law enforcement

8

purpose"); *cf. Hope v. Pelzer*, 536 U.S. 730, 745 (2002) (concluding that officials were on notice that their conduct violated clearly established law even without a case directly on point based on the "obvious cruelty inherent in" the officers' practices and the fact that the plaintiff "was treated in a way antithetical to human dignity"). But this finding would only eliminate Pierson's entitlement to qualified immunity, not Jolley's.

Because Jolley did not personally participate in the unconstitutional conduct, he cannot be held liable under § 1983 unless there is "a causal connection between" his actions "and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360. Such a causal connection can exist if Jolley had "an unlawful policy or custom" that results in deliberate indifference to constitutional rights or if he was "deliberately indifferent to a lawful policy being repeatedly violated." *Alston*, 954 F.3d at 1321. The necessary causal connection can also be established if Jolley "knew that the subordinates would act unlawfully and failed to stop them from doing so'" or if "a history of widespread abuse put[] [him] on notice of the need to correct the alleged deprivation, and he fail[ed] to do so." *Cottone*, 326 F.3d at 1360 (quoting *Gonzalez v. Reno*, 325 F.3d 1228, 1234-35 (11th Cir. 2003)). "The deprivations that constitute widespread abuse sufficient to notify [Jolley] must

be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Keith v. DeKalb Cnty.*, 749 F.3d 1034, 1048 (11th Cir. 2014) (quoting *Hartley*, 193 F.3d at 1269). Qualified immunity would also not be available to Jolley if his failure to train his employees "amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact" and the failure to train causes the injury of which the plaintiff complains. *Id.* at 1052 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

Christmas makes the following arguments that a causal connection exists between Jolley's actions and Pierson's unconstitutional conduct. First, she argues that Jolley failed to take appropriate action when he knew that Pierson had a propensity to use excessive force during traffic stops. In support of this argument, Christmas points out that in August 2015, Pierson was involved in a traffic stop of an eighteen-year-old suspect named Nicholas Dyksma following a high-speed chase. Pierson pinned Nicholas to the ground and used his knee to apply pressure to Nicholas's neck, even after Nicholas was handcuffed and no longer resisting.[4] *Dyksma v. Pierson*, No. 4:17-CV-41 (CDL), 2018 WL 3430684, at *3 (M.D. Ga. July 16, 2018), *aff'd*, 763 F. App'x 909 (11th Cir. 2019) (per curiam).

---

[4] Pierson argues that his knee was on Nicholas's back and not his neck, but the Court found based on the video evidence that Pierson's knee was on Nicholas's neck. *Dyksma*, 2018 WL 3430684, at *3.

10

Nicholas died. Based on his review of the dash cam video of the incident, Jolley did not believe, as a factual matter, that Pierson used more force than was necessary under the circumstances. Jolley did not take any disciplinary action against Pierson or offer him remedial training regarding use of force during traffic stops. Christmas argues that if Jolley had taken some corrective action to retrain or discipline Pierson on the appropriate use of force, it would have prevented Pierson from sexually assaulting her. Even if the Court were to find that Jolley should have given Pierson extra training in proper restraint techniques after Nicholas died, it is unclear how such training would have prevented Pierson from engaging in a completely different type of force during a traffic stop— criminal sexual assault. Thus, the Court finds that Jolley's failure to take corrective action following Nicholas's death does not establish the requisite causal connection between Jolley's actions and Christmas's injuries.

Second, Christmas asserts that Jolley demonstrated deliberate indifference to the rights of citizens with whom his deputies came in contact by failing to keep records regarding telephone complaints about deputies, and that this failure to keep records amounts to a policy of deputies not reporting misconduct complaints up the chain of command. Christmas speculates that if C.T., L.F., or M.A. had called to report

11

Pierson's conduct, the complaints would have been ignored.  But Christmas pointed to no evidence that C.T., L.F., or M.A. reported Pierson's conduct to the Sheriff's Office before the GBI investigation.  She also did not point to any evidence that Jolley or his staff ignored serious complaints that were made by telephone instead of by an official written complaint.  Rather, the evidence shows that when Jolley received the telephone call from Pierson's ex-wife regarding alleged stalking, he investigated the matter.  When Jolley received the telephone call regarding Christmas's assault, he immediately called the GBI.  And when Goodrich received notification of M.A.'s assault report from Harris County 911, he interviewed M.A. and gave the information to the GBI.  Moreover, even if the Court could infer from the record that the failure to keep records of telephone complaints about traffic stops might have resulted in some complaints not receiving proper attention, Christmas did not point to any binding authority clearly establishing that such a failure amounts to deliberate indifference to the constitutional rights of citizens under the circumstances presented here.  The Court thus finds that Jolley's failure to keep records of telephone complaints does not create a genuine factual dispute as to a causal connection between Jolley's actions and Christmas's injuries.

12

Third, though Christmas acknowledges that there is no evidence that Jolley knew about the incidents involving M.A., L.F., and C.T. before the GBI investigation of Christmas's allegations, she maintains that Jolley knew that Pierson's ex-wife, A.A., had reported that she believed Pierson was stalking her in his patrol vehicle.  Christmas also points out that Jolley did not issue formal findings or place anything in Pierson's file regarding A.A.'s report.  Again, Jolley testified that he looked into A.A.'s allegations and found nothing to substantiate them.  Even if Jolley reached the wrong conclusion about A.A.'s allegations, her report of stalking by her ex-husband does not demonstrate a history of widespread abuse that would put a reasonable supervisor on notice of the need to correct Pierson's behavior during traffic stops.  Therefore, Jolley's handling of A.A.'s complaint does not create a genuine factual dispute on a causal connection between Jolley's actions and Christmas's injuries.

Finally, Christmas argues that Jolley did not adequately train his deputies and should have taken corrective action in light of the "locker room mentality" that existed among his deputies, which should have put Jolley on notice of the need for training and the risk that they would engage in inappropriate behavior during traffic stops.  She relies on Pierson's inability to recall any training on the Sheriff's Office policy

13

prohibiting sexual activity of any nature while on duty and testimony regarding banter about sexual conquests unrelated to traffic stops. The Court rejects Christmas's contention that better training would have had any effect on Pierson's alleged conduct here. He certainly knew that it was against department policy and a violation of the law to sexually assault a citizen who he detained during a traffic stop. Furthermore, counsel for Christmas takes the testimony regarding "locker room talk" out of context. Although Pierson did testify that deputies bragged about flirting with and hooking up with women, Pierson also testified that (1) that he did not recall any deputy bragging about flirting with women *during traffic stops*, and (2) no one used "locker room talk" around Jolley. It is unclear how this evidence would put a reasonable supervisor on notice of the special need to even train Pierson that he should not commit the crime of sexual assault on a person in custody during a traffic stop (which is so obvious that no person should need to be told not to engage in sexual assault) or how this evidence could create a causal connection between Jolley's actions and Christmas's injuries.

In summary, Christmas's version of the facts is insufficient to show that Jolley violated clearly established law or that his alleged lack of training of his deputies demonstrated a deliberate indifference to the risk that one of

14

those deputies may sexually assault a person detained for a traffic stop. Accordingly, Jolley is entitled to qualified immunity on Christmas's claims against him in his individual capacity.

## CONCLUSION

For the reasons set forth above, Jolley's summary judgment motion (ECF No. 29) is granted. Christmas's claims against Pierson in his individual capacity remain pending.

IT IS SO ORDERED, this 29th day of December, 2020.

<u>S/Clay D. Land</u>
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA